All rise. The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning. Welcome to this argument for World Fuel Services v. Martin. I'm glad to have Judge Hurwitz sitting with us by video from Phoenix. We also welcome Judge Reyes from Arizona and thank him for helping this court with our busy docket. Counsel, please remember that the time on the clock is all of your time, including any Good morning, and may it please the Court. My name is Eric Winston of Quinn Emanuel, Urquhart & Sullivan, on behalf of Plaintiff Appellant World Fuel Services, Inc. I would like to reserve three minutes for rebuttal, if I may. The Court below orally ruled against World Fuel shortly, just minutes after the case the parties rested, because of three unprecedented and unwarranted applications of legal doctrines that, respectfully, this Court should not countenance as the law of Oregon or the law of this Circuit. The District Court's rulings rest upon the existence of two secret deals, unknown to all of the parties to the May 2013 transactions that involved hundreds of millions of dollars, that contradict the written documents for those transactions that actually bind the parties. So let me, I want to make sure, are you arguing that it's clearly erroneous for the trial court to accept witness testimony if it is different from documentary evidence? Absolutely not, Your Honor. That is not what I'm suggesting. Rather, and I'll happily get to this now if Your Honor would want, the oral testimony that was admitted, which was only admitted for non-hearsay reasons of establishing the course of conduct, only goes to one portion of one element of the Adelphi test. But when you have the written documents, which goes to elements two and three, as well as all of that together as a matter of law, the Integrated Transaction Doctrine cannot apply. Counsel, can you help me on this? You keep saying the written documents contradict the judge's findings. Isn't it more accurate to say they don't include some of the facts that the judge has? How do they contradict the judge's findings? Your Honor, that's a great question. Thank you. I worked on it hard. It certainly doesn't include information, as Your Honor just pointed out. Well, that's my point. The written documents don't say there isn't a loan and there isn't security and there isn't a guarantee. They just don't talk about this particular transaction. So why wasn't Judge Mossman entitled to look at the entire record and make his determinations? Your Honor, for purposes of the Adelphi test, and I'm going to go through each of the elements, but I think to answer your question, the written documents not only fail to address the existence of the unsecured VAC note or its conditionality or the fact it had to be repaid, but it also provides for conditions for the consummation, and it's those conditions that tell the parties what the parties to those transactions intended. And the Adelphi test has three factors or three elements, but they all imbue with the notion of intent, and it's that intent that is reflected in the documents. And the written documents include not simply the helicopter sale asset purchase agreement or the loan agreements or the world fuel payoff letter or the VAC note, but the flow of funds memo. And the flow of funds memo is one of the key documents that Judge Mossman below certainly acknowledged was there, but it tells us exactly how all of the funds came into the transaction and how all the funds went out of the transaction. And that document, it is undisputed from the record, in fact, both the fact and expert witnesses of the appellee conceded this, that document shows not a single dollar went to VAC, sorry, went from VAC to consummate the transactions. Rather, VAC received money. Every dollar is accounted for in that transaction, and not a single transaction document shows VAC making a loan. Again, so here's my understanding of the record, and I want to be clear about this. There is this complicated transaction of refinancing and release of liens, et cetera, and those are the documents you're talking about. At some subsequent point, Martin makes a loan. What in those documents prevents Martin from subsequently making a loan? Oh, absolutely nothing, Your Honor, and if we suggested otherwise, that's absolutely not what we're trying to suggest. Martin can certainly make a loan to aviation. No problems with that. The question is whether that loan to aviation, the proceeds of which were then paid to Del Smith not to retire the VAC loan, and the debtor in this transaction, Evergreen Holdings, did not receive a dollar from that. Whether that Martin loan connects back to the VAC loan, which connects back to the rest of the May 13 transactions, in order to make everything integrated. Your argument is essentially, if I understand it, that this loan was a separate transaction and not integrated. 100% agree with that, Your Honor. That is exactly my position. Okay. Now, let me ask you, let me give you a hypothetical. Let's assume that the loan had been made to Holdings, to the holding company. The holding company had given the property as security, to entrust the property as security, and then the holding company turned around and loaned the money to the subsidiary, which then paid off a promissory note that it had to Delford. Would that be a fraudulent conveyance? Certainly not the one that World Fuel raised, because it would not be a constructive fraudulent conveyance. I understand, but I'm trying to figure out how your client was damaged by the fact that the loan went to the subsidiary rather than the holding company, and then the holding company just moved the loan down to the subsidiary. In other words, aren't we just talking about formalities here? Absolutely not, Your Honor, but you raise, again, a very good question, and I think it's important to understand for purposes of fraudulent transfer, the debtor and the other entities involved. And in fact, this came up the last time we were here in this case, Your Honor, the difference between Holdings, the debtor, and the subsidiary, Aviation. When Mr. Martin made his loan in July of 2013, had he made that loan directly to Holdings in exchange for the deed of trust, there would be no fraudulent transfer, because that's reasonably proven value. Okay. Stop there for a second. I agree with you. Now, let's assume that Holdings then loaned the money to the subsidiary, Aviation, and Aviation used that money to pay off a debt to Delford Smith, or whatever his name is. Why would that cause a problem? If, at the time, Holdings made that loan to its wholly insolvent subsidiary, which then uses the proceeds to pay a shareholder, an insider, that would be a separate fraudulent transfer. That would be a classic fraudulent transfer. I don't understand why, if it made it in order to pay off a real debt. In other words, there was a real debt. The shareholder put money into the subsidiary, and the subsidiary then borrowed money to pay him off. Why would that be a fraudulent transfer? I think, Your Honor, in some ways, it's getting to what's called the indirect benefits doctrine, but when- Well, I guess I'm focusing more on the good faith of the lender. It's after all the good faith of the lender that we're concerned about. He got value in return for his loan. He doesn't care whether the money is spent by the subsidiary to pay off a promissory note or to buy widgets. In this case, I'm having difficulty figuring out how I can conclude that Martin acted in bad faith. Your Honor, that was the last ground that the judge below addressed, which was the good faith defense under Oregon Fraudulent Transfer Law. That defense has two elements. One is whether the transferee, Mr. Martin in this case, acted in good faith. While that was litigated below, that is not an issue on appeal today. The second element- As a matter of fact, the judge found that he did act in good faith. That is correct. But the second element, the one the judge did not address, is that there must be value given to the debtor, and it must be given directly to the debtor. That is both in the statute- No, it's not. That's where I want to ask you a question. Tell me what case you find for the proposition that the value must be given directly to the debtor as opposed to its parent corporation. So the debtor here, just so that- and I realize this is a bit of a confusing, complex- I understand. The debtor is holdings. The debtor is holdings. So when a subsidiary of a debtor gets value, if the subsidiary is solvent, the parent company gets value because the stock gets value. But if the subsidiary is insolvent, then the parent gets no value because it's throwing good money after bad. Thank you. You're taking me to the point I wanted to ask you about. As I read the Oregon cases, they say there's no presumption of indirect benefit if the subsidiary is insolvent, but that as a matter of fact, you can prove indirect benefit at trial, and the judge found indirect benefit at trial. So tell me why Judge Mossman was clearly erroneous to find indirect benefit from, in effect, the money flowing into the subsidiary. Yes, Your Honor. So the judge below found that the indirect benefits test was satisfied for the same reasons as the integrated transaction test. That's just not correct as a matter of law, both this court's Frontier Bank case and the on-point analysis of the issue. I'm just reading Renegade Holdings, and Renegade Holdings says there's no presumption of indirect benefit under those circumstances because it's an intensely factual issue and has to be litigated at trial. It doesn't say you can never show indirect benefit. The presumption, Your Honor, where a parent gets an indirect benefit because its subsidiary receives something, that's the presumption, but the presumption does not ever apply as a matter of law if the subsidiary is wholly insolvent. I agree. I agree the presumption doesn't apply, but as I read Judge Mossman's oral ruling, he said something more. He said it did get an indirect benefit because the subsidiary had a debt, a promissory note that it owed to the sole shareholder, and that was discharged, so the subsidiary was thereafter worth whatever the amount of that debt was, more than it was before. Why is that factual finding clearly erroneous? Because under any circumstance, and this was Judge Mossman's finding, aviation was insolvent both before and after. The parent company, which gave the collateral, got no value for that because its subsidiary remained insolvent both before and after the transaction. And that's undisputed in the record. And that's why the indirect benefits analysis is just wrong as a matter of law. And Renegade Holdings just happens to be the best case that discusses it, but it's consistent with this Court's Frontier Bank case because the question for reasonably equivalent value and the indirect benefits test is what was the net effect of the creditors of the debtor? So if I take that to WorldFuel, before and after the transaction in July 2013, WorldFuel was still owed the exact same amount of money, but the collateral available to it went down because the one unencumbered asset of Holdings was given away. Well, doesn't a debtor's mere expectation that it would benefit from a deal, couldn't that constitute value if it was a legitimate and reasonable expectation? For purposes of the reasonably equivalent value test, there is case law that suggests in the indirect benefits analysis that can be the case. That does not apply here because, as I've hopefully got across to your honors, it can't apply when the subsidiary is wholly insolvent. Well, wasn't the fact that WorldFuel took part in the helicopter deal and continued selling fuel to aviation after the deal suggest that it was reasonable for Holdings to believe that the deal would succeed? In May of 2013, that is true, and we are not challenging that Holdings received reasonably equivalent value for the May 2013 transactions. The whole fight here is whether the secret VAC note and the secret condition attached to it and the Martin loan repaying it, you know, 18 months before it was actually due and not in default, whether that constitutes reasonably equivalent value to Holdings in July of 2013. So, counsel, if I understand you correctly, you're saying you're not disputing that the restructuring plan for aviation would benefit Holdings, that you would concede? Correct. Now, my understanding is that the district court found as a factual matter that the arrangement between Smith and Ventures and Aviation and the first and second lien holders to renegotiate the 11th hour debt exception that would allow them to encumber the land at issue and then eventually get the loan from Martin to pay back Smith was necessary, was critical to save the restructuring deal to save aviation, which Holdings and everyone else, including WorldFuel, believed might save aviation. So is that factual finding that that 11th hour deal that we're talking about was critical to the restructuring plan clearly eroding it? So the factual finding that the court made was that it was Del Smith's expectation that he would get repaid by making this loan. It was only admitted for that purpose, that course of conduct. It was not admitted for the truth. And we fought very hard about making sure it was stayed out to prove the party's intentions. It's merely Del Smith's expectation. And expectation alone, we're not saying that wasn't his expectation, but expectation alone is insufficient as a matter of law under the Adelphi test. In fact, Adelphia says that because Adelphia says merely because you expect the subsequent transaction to occur doesn't satisfy the knowledge and intent element, as well as the second and third elements, if there's no other evidence that supports it. And Judge Mosvin, in his ruling, made a point of saying it was Ms. Berselli's out-of-court, non-admitted-for-the-truth testimony of what Mr. Smith thought to prove integrated transaction doctrine applied. It can't as a matter of law. So the finding isn't clearly erroneous. The application of the law is erroneous as a matter of law. So you're arguing— Could I ask one more question before counsel sits down so I don't forget about it? I take it there's no factual dispute that Delford Smith actually loaned money to aviation? There is no factual dispute that there was a VAC unsecured note. There is— I know. I know it was an unsecured note. I wasn't asking that question. I'm asking, did actual money get loaned to VAC? There is documentary evidence of a wire transfer from VAC. Okay. That was my— Thank you. That was the question I had. All right. I know I'm, I think, now out of time.  We'll give you another minute for rebuttal. Okay. For rebuttal, if you please. At the end. Thank you very much. Good morning, Your Honors. May it please the Court, my name is Megan Houlihan, and I represent the Defendant Appelee, Mr. Andrew Martin, in this case. The central question for Your Honors is whether Evergreen Holdings received reasonably equivalent value. When it granted Mr. Martin a deed of trust on Holdings Headquarters property, in return for Mr. Martin's $4.2 million loan to Holdings subsidiary, Aviation. After a two-day bench trial, the district court ruled that Holdings did receive reasonably equivalent value because Mr. Martin's loan was part of an integrated transaction that happened in May 2013 that gave Holdings the opportunity to restructure its debt and that gave Holdings and its subsidiaries a chance at survival. Can I ask you just a quick question about the integrated transaction? Regarding the knowledge and intent of the parties, Mr. Winston mentioned this was a secret deal, and there's some argument that only relevant parties need to be aware of it. How do you define a relevant party? Why was World Fuels not a relevant party? I think relevant party means a decision maker, someone that actually had power to make the And a deal like this, there were about 100 creditors. There were a lot of pieces of the puzzle that had to come together. But the parties, the players making all of these pieces come together were the first and second lien holders, the parties to that first and second credit agreement. It was Holdings, the borrower, Holdings subsidiaries like Aviation, Dell Smith, the owner of everything, the chairman of the board of Holdings, and Mr. Martin. Those are the relevant parties here that needed to know about the first transaction and the second transaction. Is there any case law that helps us define what a relevant party is for purposes of integrated transactions and the knowledge and intent of the parties? The Kirchner case or Enry Tribune that both parties have cited talks about relevant parties, but I don't think it supplies a definition per se of who those parties need to be. In Adelphia, it does talk about all the parties involved in the transactions. And here, the parties involved in both transactions would be those involved in both. So that wouldn't include WorldFuel. As your argument, but you don't necessarily have a precedent to say that that would be how we can define the scope of the relevant parties. I think there is not clear precedent about what the relevant parties are. But I think it's also important that Adelphia doesn't require that each of the three factors be satisfied in every case, or that in every case, each factor will have equal weight, just the same as in other cases. It's really a balancing test. And if you look at a lot of the more recent case law, including the Waterford case that both parties have cited, this is about looking at economic realities, what was happening on the ground. It's not about bright line rules. So when you look at the economic realities here, as the district court did, and look at the witness testimony in the documents, what emerges is that Mr. Martin's loan was an integral part of the May 2013 transaction. And I want to walk through some of the documents that actually do show this. I think witness testimony shows it. But also, there is a lot of documentary evidence in contrast to what opposing counsel has said. First, you have the Ventures Aviation Promissory Note, which is dated May 2, 2013. That's the same date as the whole restructuring deal came together. And that was Trial Exhibit 509, Excerpts of Record 1376-79. Then you have the first and second credit agreements that you can look at. And in Section 6.1, Section M, you have these carve-outs that allow the headquarters property to be used as collateral for up to a $10 million loan. And the testimony from Mr. Martin's expert witness, Mr. Hamstreet, was that if you look at all of the documents, it's clear that this carve-out was a last-minute negotiation that happened between April 29, 2013 and May 2 to get the deal done. Because when you look at the- Counsel, can you help me on this? The carve-out is not in a document signed by World Fuel Services, correct? It's not. It's in the first and second credit agreements. Right. So, I take it, I would like you to respond to your friend's argument, which is, that's fine, but that doesn't make it an integrated transaction with the transaction that we were part of. Well, World Fuel was a party to the restructuring, but it was only part of one limited part. And Mr. Malone's testimony, he was the vice president of credit management for World Fuel, was that actually he had pretty limited knowledge of all of the pieces of the puzzle. For example, Mr. Malone didn't have knowledge of the Banner Bank loan being repaid and Banner Bank releasing its deed of trust on the headquarters property. He testified about that at excerpts of Record 305. And I don't think World Fuel is maintaining that Banner Bank getting paid off to the tune of $11.3 million was not an integral part of the transaction, despite World Fuel's lack of knowledge. Because if Banner Bank had refused to release its deed of trust on the headquarters property in this stock sale of helicopters to Erickson, it just couldn't have gotten done with that liability. So Banner Bank had the power to hold up the whole deal, to explode it at the last minute, which was really what Banner Bank was threatening to do. So the idea that World Fuel needed to know about each piece in order for it to be integral is just contradicted by the record. It doesn't make sense. I also want to address this argument that I think comes up again and again in World Fuel's briefing, I think it was hinted at here today, that somehow it was Dell Smith that got repaid instead of Ventures, which was the entity that made the loan to aviation on May 2nd. The district court concluded that it didn't really matter whether it was Ventures or Mr. Smith that got repaid, but the documents show that it was indeed Ventures. And that's the escrow instructions, Exhibit 508 at trial. It starts at Excerpt of Record 1325. And those emails back and forth that went to the title company clearly show that $3.5 million for Mr. Martin's loan was wired to Ventures on the day that Mr. Martin's loan closed on July 18th, 2013. There's also this factual... Doesn't the record also reflect that the proceeds of that loan eventually were used to pay off the promissory note? I think that's exactly right, that the escrow instructions are showing that Mr. Martin's loan was the promissory note from Aviation to Ventures, or the loan from Ventures to Aviation. Right. And doesn't the record also show that these dollars eventually flowed up to Mr. Smith? I don't think that the record shows that. There is the settlement statement that lists Mr. Dell Smith as the recipient of the $3.5 million. I think that's really an error when you compare it to the escrow instructions, which have the date of July 18th. But it doesn't matter that much because Ventures was a sole member LLC. Mr. Smith was the only member. And the testimony from the president of Aviation, Ms. Blythe Verselli, was that the Evergreen companies really drew very little distinction between Mr. Smith's single member LLCs, the companies he controlled, and Mr. Smith. There's another place in the record that I think is really clear, that Mr. Martin's loan was integrated with the earlier transaction. That's at Excerpt of Record 394. That came during Mr. Martin's testimony. And he was looking at Exhibit 501. And I think the parties have omitted 501 from the excerpts of record, but it was certainly admitted at trial and before the trial court. And that's an executive summary that lists the purpose of Mr. Martin's loan. And it said that the purpose of Mr. Martin's loan was reimbursement to owner for $3.5 million used to pay off Banner Bank's debt necessary to execute sale of Evergreen Helicopter. So everyone, including Mr. Martin, understood that the purpose of his loan was to fulfill a condition that Mr. Smith had put on Venture's loan to aviation, which was that Venture's needed to be paid back and it needed to be paid back quickly. That was Ms. Verselli's testimony, that she understood, as aviation's president, that this loan was a priority. Now, I know that the maturity date of the Aviation Venture's promissory note is not until March 31st, 2016. And that is a while after the May 2013 transaction. But the reason that there was that later maturity date really just shows how integrated the transaction really was. Because the carve-out in subsection M that allowed the headquarters property to be used as collateral said that an affiliate, such as aviation, could not take out any debt unless that loan had a maturity date that was no sooner than six months after the maturity date of the first and second lien credit agreements. And the maturity of those credit agreements was March 30th, 2016. So the fact that the maturity date on the Venture's aviation promissory note is March 31st, 2016, actually just supports Mr. Mart's new trial court's findings that these transactions were meant to be linked, that they reference each other. If you look at the Aviation Venture's promissory note, there's another piece of evidence that supports that Mr. Mart or that that loan was integrated with the May 2nd, 2013 transaction. And it's the second to last substantive paragraph of that promissory note actually refers to the first and second lien credit agreements by name and says that any obligations under the Venture's promissory note cannot impair the obligations of the first and second lien credit agreement or be satisfied before those obligations. So when WorldFuel says that these documents aren't talking to each other, they don't reference each other, that's just contradicted by the record, I think. Can I ask you a question about timing? The helicopter sale closes in May of 2013 and then the Martin loan is made in July, a few months later. Does the timing gap have any bearing on whether or not these two transactions are integrated? I think not. It's a matter of 10 weeks. And also, if you look at its supplemental... I know the amount of the time, I know the amount of the time. It's 10 weeks. The question is, does that make the integration or does that have some bearing on the integration issue? No, I don't think so. Because if you look at supplemental excerpts of record 35, trial exhibit 305, Banner Bank didn't actually reconvey its seat of trust on the headquarters property until July 18th, 2013. That was the exact date that Mr. Martin's loan closed. So in fact, given that the reconveyance of Banner Bank's seat of trust didn't happen until July 18th, 2013, Mr. Martin's loan really couldn't have closed any earlier because it was collateralized by that same headquarters property that wasn't released until that day. So this delay really doesn't affect the analysis about integrated transaction, because in these 10 weeks, there were still things happening that were effectuating that original May transaction. I think the court is aware that there are some distinctions between the Renegade case and this case, but I'd like to just highlight that Renegade was decided on a motion to dismiss. The court there was only looking at the complaint and whether there were allegations that would support an indirect benefit finding such that the defendant could argue as a matter of law that the debtor received reasonably equivalent value. And the court said, well, if you look at the complaint, there could be enough to disprove indirect benefit and show less than reasonably equivalent value. So we're going to let the case go forward. I don't think that really guides the analysis here, where there were findings of fact by the trial court after a two-day bench trial. Then there's this issue of the flow of funds memo. Why doesn't it show that the venture's loan flowed into the transaction, that that was used to repay Banner Bank? There was testimony from the expert witness, Mr. Hamstreet, that's at Excerpts of Record 101, I believe is where it starts. That that just wasn't the purpose of the flow of funds memo. That memo was to show how Erickson's $250 million, roughly, flowed out of the transaction to pay off people that had security interests or that had debt owed to them by holdings. Because it wasn't that Erickson was just going to pay holdings and trust that holdings would pay everybody off. Erickson wanted to pay those people directly and make sure that they got paid off. And that's why the flow of funds memo wouldn't have showed the venture's loan, because that just wasn't the purpose of the document. So I see that I'm almost out of time, unless there are any more questions. Mr. Martin would ask that this court affirm the district court in every respect. Thank you. May it please the court, Erick Winston, I want to pick up on a thread, Judge Reyes, that you raised about the definition of relevant party. And I think the Delphi case already tells us it's all parties, but so does the Clement manufacturing case, which the appellee cited in its brief. And in that case, the court expressly stated at pages 243 and 244 that all parties to all of the transactions knew of the challenge transaction, what was called the Sakoma APA, and, quote, contemplated that all of the agreements and all of the transactions contemplated by the agreements were related parties of the larger transaction. And the court then went on and said, quote, there are references in the Sakoma APA to the other agreements that were part of the larger transaction, and there are multiple references in the other agreements to the Sakoma APA. That is completely missing here. Counsel just talked about the Waterford case. And guess what happened in Waterford, just like every other case that has been cited. In that case, again, the documents themselves expressly referred to and conditioned themselves upon the fact that the parties had multiple agreements, even though there are separate documents. Counsel, is there anything in those cases, I understand you're saying that the factual record appears to be stronger in those cases. Is there anything that says that something that maybe is less clear, but still not clearly erroneous in terms of factual findings can't, as a matter of law, support a finding of an integrated transaction? Because none of the cases confronted a circumstance where you had the written documents saying X and the oral testimony that's not admitted for the truth saying not X, I can't supply you, I can't answer that question because the test by definition asks if there's written documents, elements two and three of the Adelphia test, it by definition means you've really got to look at the documents. And in the cases that typically have upheld the use of the integrated transaction doctrine, like the Crescent case, comment about the painstakingness of the documentation. So look what happened here. But in Adelphia, the court actually found the witnesses to be not credible and then relied on the documents alone. And in this case, we have a district court judge after a bench trial who finds the witnesses to be credible and then says, you know, I don't see a contradiction between the documents and the witness testimony. When I put it all together, I find an integrated transaction. How that to me seems like we're reviewing those factual findings for clear error. So I was in Adelphia. There was a there was two documents that that clearly didn't recondition themselves. There was a board memo that said it's anticipated entering to these two documents and there was testimony that said we anticipate entering to those two documents. The court found it not credible that they reflected an intent to integrate primarily an expectation. Here, the court below admitted testimony of one witness to prove that the course of conduct of one person to the transaction. That is we're not suggesting is clearly erroneous. But to elevate it, to prove the intent of the parties, which even the court below said it would not do, is the only way to get to the conclusion that it wanted. And that's ignoring the other elements of the integrated transaction test. Counsel just commented about the VAC note, if I can just take a few extra seconds to address that. The VAC note was executed on the same day. So then why wasn't it included in the flow of funds memo when VAC itself was getting paid? Why didn't, like the first and second lien loan agreements, the asset purchase agreement, even the World Fuels payoff letter say it was conditioned upon the consummation of all the other transactions? The unsecured note doesn't say that. In fact, at the end of it, which is what your client, what would your client have done differently? Our client, World Fuels, if they had known about this, they would have, I would be speculating because they didn't. So one thing would have happened, the transaction, if the transaction blew up because the loan wasn't made to pay off Banner Bank, your client wouldn't have collected what, $4.5 million out of the restructuring, right? So the evidence actually shows Banner Bank was paid off from the sale transaction, not from VAC. That was undisputed testimony and acknowledged by their own expert witness. So my point is your client benefited from the closing of the restructuring, correct? Correct. And there's plenty of testimony here that the restructuring would not have been completed in the absence of these transactions, which the judge believed. So I guess, I guess what you're asking us to do is to keep the transactions you like and throw out the ones you don't like. We are asking that this court not expand the integrated transaction doctrine to include secret deals that not every party to those transactions know about when there's not a single case out there that supports it. We do not, we're asking that this- Even if those deals benefit the parties who don't know about them, because the testimony here is that the restructuring would not have been completed in the absence of these, what you say are secret deals. And that testimony was not offered for that truth. It was offered to show the course of conduct of Mr. Smith. When, if it, your Honor is going to exactly the problem with the district court's ruling. It elevates course of conduct to prove the truth that can't be the case. And the judge below knew it because when they tried to do it on redirect of Ms. Borselli and we objected on hearsay grounds and counsel said, we're offering it to show the intent of the parties, Judge Motsman said, you can't do that. That's hearsay. And that's, that's the problem with, with the conclusion. It's, it can show Mr. Smith's intent. It can show his expectation, but that expectation doesn't make it into the documents and the documents and the judge below acknowledged this, go the other way. So is it going to be the rule in the law, in the state of Oregon, that for a fraudulent transfer, that, that transactions that no one knows about can, can, can nonetheless impact their rights? That seems, that seems unprecedented. It is unprecedented. Let me just ask you one last question. And along those lines, is there any authority other than Adelphia's general use of the word all that specifically supports your contention that literally every party to the restructuring deal needs to know of the disputed transaction? So the Clement manufacturing case uses the word all. And I would submit that that is common sense because in World Fuel's case, it knew about the helicopter sale. In fact, that was a condition to its payoff. Its, its financial information was included in the flow of funds memo. It would not risk its rights because even though it got a benefit from the transaction, it was also surrendering collateral. Well, what I'm getting to is you say all means literally everybody. The other side says all just means all relevant parties. Is there any case that supports your position that all means literally everybody? So to me, all relevant parties means the parties to the transactions to be integrated. So if the VAC note and Mr. Martin's loan are to be integrated with the helicopter sale APA, the first and second liens, the World Fuel payoff letter, the Banner Bank payoff, the other documents that that the expert didn't even look at, at least someone needs to know about them. How do you respond to the counter argument that World Fuel acknowledges that it didn't know about all the parts of the restructuring deal, yet there can't be any dispute that, for example, the Banner Bank transaction, part of the restructuring deal was critical to that deal. You know, Mr. Malone definitely testified when he was asked whether he knew about it was Banner Bank being paid off and he said he didn't know, but he did know about the helicopter sale. He did know about World Fuel, knew about the first and second liens being restructured. It did know about how the flow of funds was supposed to work because you see their information in the flow of funds memo. That's that's sufficient. If VAC had been listening, the flow of funds memo, there is no chance I would win this show knowledge and intent of the parties, but it's not. And every dollar that went to and from that transaction is accounted for in that document. VAC's loan is not, even though VAC itself is getting paid seven million dollars out of that transaction. It's an astonishing concept to take based upon oral testimony of somebody who wasn't even part of the negotiations, but what she heard from somebody else, that that results in these transactions being integrated. That is exactly what this court is being asked to affirm. And that can't be the law. Wasn't there something other than that testimony? Wasn't the closing of the original restructuring postponed to allow this loan to be made and the banner to be paid off? Actually, I think the facts demonstrate it was not because while they all happened on the same day, the closing happened with the flow of funds showing where the money went. And when you look at the VAC note, the last sentence of it, it looks as if the amended and restated first lien and second lien loans had already occurred. And that actually makes sense. That happens a lot in commercial transactions. That's why the flow of funds have numbers to them. This one happens first. This one happens last. The VAC notes outside of that, which is not surprising. I mean, it's not surprising that this business continued to incur debts and spend money. Do I have any more time? Am I done? I think we're done here. Unless any of my questions. Thank you. Thank you very much. Do you have any other questions? Thank you. Thank you. All right. Well, that this case is submitted for a decision. I thank counsel for your helpful arguments. And that concludes our session for the day. All rise. The court for today stands adjourned. Thank you.
judges: HURWITZ, SUNG, Rayes